MATT JOYCE, APPELLANT, V. BEN P. MILLER ET AL., APPEL-
LEES.

FILED MAY 7, 1908. No. 15,192.

1. Appeal: EVIDENCE. The admission of immaterial evidence is not reversible error unless it is shown to have in some manner prejudiced the rights of the complaining party.

2. ———: INSTRUCTIONS. An instruction which responds to the issues made by the pleadings and is predicated on the evidence cannot be successfully assailed by the defeated party.

3. ———: ———. It is not error to refuse an instruction requested in behalf of either party to a cause where the subject matter of the instruction is fully stated and explained in the charge of the court to the jury.

APPEAL from the district court for Johnson county: JOHN B. RAPER, JUDGE. *Affirmed.*

*Hugh La Master,* for appellant.

*S. P. Davidson, contra.*

BARNES, C. J.

This was an action brought in the district court for Johnson county to recover the purchase price of a lot of range horses. The plaintiff, who resides in the state of Idaho, alleged in his petition, in substance, that on the 25th day of August, 1902, and for some time prior to that date, the defendants were engaged in the business of buying western horses and shipping them to eastern points for sale; that the business was conducted mainly by the defendant Ben P. Miller, but that Minnie A. Miller was interested therein; that on the said day the defendants

purchased from the plaintiff a number of horses for the agreed price of $1,274, which was also their actual value; that at said time the defendants, acting through Ben. P. Miller, stated and represented to plaintiff that they had a much larger sum than $1,274 on deposit in the Chamberlain Banking House of Tecumseh, Nebraska, and that said bank was solvent and a reputable banking institution doing a general banking business in said state; that at said time defendants knew that each and all of said representations were false, and they were made for the purpose and with intent of obtaining plaintiff's property, and thereby defrauding and cheating him; that each of said representations was wholly false and fraudulent; that the defendants had no money whatsoever on deposit in said bank, and had no credit there; that said bank was then wholly insolvent, and was about to go into the hands of the state banking board of the state of Nebraska; that the insolvency was fully known to the defendants; that for the purpose of getting possession of said horses the defendants gave a check to the plaintiff on said bank for $1,274, signed by Ben P. Miller in the name of M. A. Miller; that plaintiff believed the representations of the defendants, and relied thereon, and accepted said check and delivered the possession of said property to the defendants; that defendants took the same, intending not to pay the plaintiff therefor, and intending to cheat and defraud him out of the purchase price of said horses; that the check was duly presented in the usual course of business to the Chamberlain Banking House, but was not paid, but was protested, and the same has never been paid, nor has plaintiff received anything for his said horses. Defendant Ben P. Miller admitted the purchase of the horses; denied the other allegations of the plaintiff's petition, and pleaded, among other things, a discharge in bankruptcy as a defense to the action. Minnie A. Miller, by her answer, denied that she was in any way connected with the transaction; admitted that the check in controversy was signed by the defendant Ben P. Miller in the name of M. A. Mil-

ler; alleged that the plaintiff well knew that Ben P. Miller
was acting for himself; that she was a married woman
living with her husband; that the check was not signed
nor the indebtedness incurred in reference to or upon the
faith and credit of her separate estate, and therefore that
she was in no way liable for the indebtedness sued upon.
The plaintiff, by his reply to the separate answer of the
defendant Minnie A. Miller, alleged that she was an un-
disclosed principal at the time said contract was entered
into, and that thereafter he learned of her interest therein;
admitted that she was the wife of defendant Ben P. Mil-
ler; and alleged that the indebtedness was incurred in
reference to and upon the faith and credit of her separate
estate. The plaintiff further alleged that, having allowed
the defendant Ben P. Miller to transact the business in
her name, she was estopped to deny her liability in the
transaction complained of. A trial was had, which re-
sulted in a verdict and judgment for both defendants, and
the plaintiff brings the case here by appeal.

The plaintiff now concedes that the discharge in bank-
ruptcy of the defendant Ben P. Miller, which was pleaded
as above stated and was duly proved upon the trial, was
sufficient to authorize a judgment in his favor. So we
may consider the case disposed of, so far as it relates to
any liability on his part. The plaintiff contends, how-
ever, that he should have recovered a judgment against
the defendant Minnie A. Miller, and alleges that the dis-
trict court erred in receiving evidence of the manner in
which the defendant Ben P. Miller conducted his busi-
ness after the failure of the Chamberlain Banking House.
It must be remembered that plaintiff's main contention
on the trial below was that the manner in which Ben P.
Miller conducted his business with the Chamberlain
Banking House at the time of the purchase and sale of
the horses in question showed that his wife had a pecuni-
ary interest therein, and was in fact an undisclosed prin-
cipal in the transaction. To prove that the wife had no
direct interest therein, and to rebut any presumption of

fraud, the defendants introduced the evidence complained of. While this evidence was not very material, it is impossible for us to imagine how it could have been at all prejudicial to the plaintiff. It is true that immaterial evidence should not be received, but its reception does not constitute reversible error, unless it is shown that it in some manner prejudiced the rights of the complaining party.

It is further contended that the court erred in admitting evidence that a telegram was sent by a son of the defendants from Grand Island, Nebraska, to the banker at Nampa, Idaho, informing him and the plaintiff that the Chamberlain Banking House had failed, and that the horses were in Grand Island. Complaint is also made because the defendants were allowed to prove that the railroad men at Grand Island would not deliver the horses until the defendants' son signed a release for them; that they told one Palmer, who purchased a part of the horses, that there was something wrong with them; that a lawyer was thereupon consulted, and the horses were thereafter sold. This evidence is in the same class with that which has just been considered. At most, it was only an explanation of the manner in which the shipment of horses was handled and disposed of, and, while it might have been rejected without error, its reception could not prejudice the plaintiff's substantial rights.

Plaintiff also contends that the court erred in giving instruction No. 4, asked for by the defendants, and the criticism on that instruction is that it was thereby made incumbent upon the plaintiff to have had knowledge of the interest of Minnie A. Miller in the transaction at the time it occurred, and that it further stated to the jury that, if the transaction was not had in view of or upon the faith and credit of her separate estate, she was not liable. An examination of the instruction, which is found in the record, shows that this criticism is not well founded. By it the jury were told, in substance, that, if they believed from the evidence that the Chamberlain

Banking House authorized Ben P. Miller to draw checks aggregating in amount not exceeding $4,000 on said bank in the name of Mr. M. A. Miller, that Ben P. Miller transacted the business relating to the purchase of the horses in controversy in the name of M. A. Miller, and that plaintiff was not in any way misled into the belief that he was doing business with Minnie A. Miller, and they should further believe from the evidence that the defendant Minnie A. Miller had no knowledge of the transaction in controversy, and had no interest in it whatsoever, they should find for her, provided they should further find from the evidence that she was a married woman, and the transaction in controversy was not had in view of or upon the faith and credit of her separate estate. It seems to us that this instruction fairly responded to the issues in the case. An examination of the record discloses that there was no substantial conflict of evidence upon any question except that of fraud. The plaintiff and one Mock, a banker at Nampa, testified that the defendant Ben P. Miller at the time he made his purchase represented that he was a man of means; that he had on deposit with the Chamberlain Banking House more than $4,000, and that institution was one of the strongest banks of the country; that he presented a letter of credit for $3,000 issued by the bank at the time he made his check to pay for the horses in question, and that one Taylor was present at that conversation. The defendant Ben P. Miller testified that he purchased 250 head of horses from the plaintiff on the 16th of July, 1902; that the plaintiff was unable at that time to deliver more than 150 of them; that he went into the bank at Nampa with the plaintiff and presented his letter of credit, wherein the Chamberlain Banking House had stated that Mr. M. A. Miller was entitled to draw checks on that institution to an amount not to exceed $4,000; that the banker took the letter and went to a book he had in the bank, evidently for the purpose of looking up the standing of the Chamberlain Banking House, came back, and in-

formed the plaintiff that the matter was all right, and defendant's check for the price of the 150 head of horses was good; that the check so given by him was paid in the due course of business; that the arrangement then was that, when the balance of the horses which he had purchased were ready for delivery, the plaintiff was to notify him of that fact; that he received such notice in the latter part of August, and went to Nampa to receive the horses; that they were delivered to him by the plaintiff, and at that time he had a letter of credit from the Chamberlain Banking House authorizing him to draw checks on that institution to the amount of $5,000; that the banker at Nampa examined his letter of credit, told the plaintiff that his check to pay for the horses was good, and that he thereupon drew and delivered it to the plaintiff, and had the amount of it indorsed on said letter. He further testified that at that time he had no knowledge, suspicion or belief that the Chamberlain Banking House was about to fail, but supposed it was entirely solvent; that he had no notice of its failure until his return to Nampa, some ten days later, from a trip in the mountains, when he was told by Banker Mock and the plaintiff that the Chamberlain Banking House had failed, and that they had received a telegram from his son stating that fact, and that the horses were at Grand Island. He also testified that his wife Minnie A. Miller had no interest in the transaction whatever, and in fact knew nothing about it. His evidence was corroborated by the testimony of the witness Taylor, and we have no hesitancy in saying that, as applied to the evidence, the instruction complained of was a correct statement of the law.

Plaintiff also claims that the court erred in refusing to give instruction No. 13, tendered by him. We have examined all of the instructions, and find that the propositions contained in that request were submitted to the jury by other instructions given them by the court, and so the request was properly refused.

Finally, it is contended that the court erred in giving defendants' instruction No. 3. It is claimed that by it the jury were told that the giving and acceptance of the check in question was a payment for the horses. This criticism is not well founded. We find that the statement contained in that instruction was, in substance, that, if the jury should find by a preponderance of the evidence that the check was in fact received as payment for the horses, they should find for the defendant.

We have carefully read the whole record, and are satisfied that the verdict is amply sustained by the evidence. The fact is that the plaintiff failed to show that the defendant Minnie A. Miller had any interest in, or knowledge of, the transaction complained of; that she was guilty of any fraud or misrepresentation, or that the credit was extended to Ben P. Miller on the faith of her separate estate. In short, the record conclusively shows that she was not known by the plaintiff, and there is no competent evidence in the record which even tends to show that she was an undisclosed principal in the transaction. Again, we are satisfied that there was no fraud practiced in the original purchase and sale of the horses, and, but for the failure of the Chamberlain Banking House, the plaintiff would have received his money by the payment of the check given him by the defendant Ben P. Miller; that, but for the discharge in bankruptcy of the said defendant, plaintiff would have secured a judgment against him, which was all the relief his evidence entitled him to receive.

Finding no reversible error in the record, the judgment of the district court is

AFFIRMED.